UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X


In re
CBI HOLDING COMPANY, INC., <u>et al.</u>,                    Chapter 11
                                                           94 B. 43819 (BRL)
            Debtors,


-------------------------------------X

BANKRUPTCY SERVICES, INC.,

               Appellant-Cross Appellee,        01 CV 0131 (KMW)
                                                OPINION & ORDER
     -against-

ERNST & YOUNG and ERNST & YOUNG, LLP,

               Appellees-Cross Appellants.

-------------------------------------X

    In 1996, Plaintiff Bankruptcy Services, Inc. ("Plaintiff")

brought this action in the Bankruptcy Court of the Southern

District of New York, on behalf of CBI Holding Company, Inc. and

most of its subsidiaries (collectively, "CBI") and Trade Company

of The West ("TCW"), an investor in CBI.[1]  Plaintiff alleged that

Defendant Ernst & Young ("E&Y") committed malpractice and fraud

---

[1]  CBI filed for Chapter 11 bankruptcy in 1994.  BSI was
appointed as assigning agent in CBI's Bankruptcy Reorganization
Plan.  BSI represents the interests of CBI and TCW in adversary
proceedings arising out of the bankruptcy.

1

when it audited CBI's 1992 and 1993 financial statements.[2]  In 2000, after a bench trial, the Bankruptcy Court granted judgment in favor of Plaintiff.[3]  E&Y appealed the Bankruptcy Court's ruling to this Court.  In 2004, the Court vacated the Bankruptcy Court's judgments.

BSI appealed the Court's ruling to the Second Circuit, and E&Y cross-appealed.  In 2008, the Second Circuit affirmed the Court's decision in part, reversed in part, and remanded the case to the Court for proceedings in accordance with the Circuit's decision.

The Court must now decide three issues that E&Y raised on appeal with respect to the claims BSI asserted on behalf of CBI (the "CBI Claims")[4] that the Court did not decide in 2004, but

---

[2]  BSI brought seven claims against E&Y.  Specifically, BSI brought five claims based on E&Y's alleged malpractice in auditing CBI's 1992 and 1993 financial statements: (1) breach of contract; (2) negligence; (3) negligent misrepresentation (4) breach of fiduciary duty; and (5) set-off of damages.  BSI brought two claims for fraud based on E&Y's audits of CBI's 1992 and 1993 financial statements, and on its re-audit of CBI's 1993 financial statements.

[3]  The Court granted judgment in favor of BSI on six claims, but dismissed BSI's claim for negligent misrepresentation.

[4]  BSI brought all seven claims on behalf of CBI and certain claims also on behalf of TCW.  The Bankruptcy Court's judgment on the claims BSI asserted on behalf of TCW (the "TCW Claims") has been vacated, on the grounds that E&Y is entitled to a jury trial in the Bankruptcy Court on those claims.  The jury trial on the TCW Claims has not yet been scheduled.

which have become relevant again following the Second Circuit's decision: (1) whether the Bankruptcy Court had sufficient legal and factual basis for its ruling that E&Y committed malpractice and fraud; (2) whether there was sufficient evidence to support the Bankruptcy Court's ruling that E&Y's conduct caused CBI's losses; and (3) whether the Bankruptcy Court committed clear error in its determination of the damages E&Y owed on the CBI Claims.

The Court holds that: (1) the Bankruptcy Court had sufficient legal and factual basis for its finding that E&Y committed malpractice, but did not have a sufficient basis for its finding that E&Y committed fraud; (2) there was sufficient evidence on the record to support the Bankruptcy Court's ruling that E&Y's conduct caused injury to CBI; and (3) further proceedings are necessary in the Bankruptcy Court with respect to the damages awarded against E&Y.  The judgment of the Bankruptcy Court is AFFIRMED in part, REVERSED in part, and REMANDED to the Bankruptcy Court for further proceedings in accordance with this decision.

I.  Background[5]

   A.  Parties

   CBI was a wholesale distributor of pharmaceutical products.
Its business consisted of buying pharmaceutical products from
manufacturers, and warehousing them for delivery to various
entities, including retail pharmacies and hospitals.  In 1994,
CBI filed for Chapter 11 bankruptcy.

   Robert Castello ("Castello") was CBI's President and
Chairman, and owned a 52% stake in the company.

   TCW is an investment firm that held a 48% stake in CBI.

   E&Y is an accounting, tax, and consulting firm.  E&Y became
CBI's independent auditor in June 1990.  E&Y performed audits of
CBI's financial statements for fiscal years 1992 and 1993 (the
"Audits").  In 1994, E&Y began a re-audit of CBI's 1993 financial
statements (the "Re-Audit").

   Louis Scerra ("Scerra") was E&Y's lead auditor for the
Audits and the Re-Audit.

---

   [5] The bulk of this section derives from the Bankruptcy
Court's findings of fact, see Bankr. Servs., Inc. v. Ernst &
Young (In re CBI Holding Co.), 247 B.R. 341, 247-62 (Bankr.
S.D.N.Y. 2000) [hereinafter CBI I], and the Second Circuit's
opinion, see Bankr. Servs., Inc. v. Ernst & Young (In re CBI
Holding Co.), 529 F.3d 432, 437-43 (2d Cir. 2008)[hereinafter CBI
II].

B.  Facts

In the early 1990s, in order to stay competitive in its industry, CBI undertook a strategy of growth by acquisition.  In 1992 and 1993, CBI financed the purchase of four other pharmaceutical wholesalers through a series of lending agreements with a bank syndicate, and through capital invested in CBI by TCW.  CBI's shareholder agreement gave TCW the right to take control of CBI under certain circumstances.[6]

1.  CBI's fraud

Despite CBI's having received loans and investments, CBI's earnings were insufficient to sustain its desired level of borrowing.  Castello and other members of CBI's management engaged in a scheme to falsely inflate the company's earnings for the 1992 and 1993 fiscal years.

The management's scheme consisted largely of inventory fraud.  In particular, CBI's management intentionally failed to record some invoices during the fiscal year in which the goods associated with those invoices were either purchased or received.

_____

[6] Specifically, the CBI shareholders' agreement gave TCW the right to take control of CBI upon the occurrence of a "control triggering event."  The agreement defined "controlling triggering event" as (1) a breach of the earnings to fixed charge ratio specified in the CBI securities agreement; or (2) a failure to pay the principal on TCW's corporate notes.

By not recording liabilities, CBI's management understated CBI's accounts payable and fraudulently overstated the company's 1992 and 1993 earnings.

In order to continue to receive merchandise from vendors, CBI had to pay at least some of the unrecorded invoices during the fiscal year in question. To avoid raising questions about missing invoices (which might lead to the discovery of the unrecorded liabilities), CBI's management recorded the payments as "advances": payments made to vendors from whom CBI purchased on credit, which reduced CBI's overall account balances with those vendors. When an advance payment was recorded, it was not associated with any particular invoice.[7]

In addition to the inventory fraud, Castello also defrauded CBI with regard to his annual bonuses – among other actions, he took a portion of his 1993 bonus early and calculated his bonus based on falsely inflated earnings.

2.  E&Y's 1992 and 1993 audits

E&Y issued unqualified audit opinions with respect to CBI's 1992 and 1993 financial statements. E&Y's opinions stated that

_____

[7] In addition to the fictitious advance payments, CBI's management also created fictitious inventory, and engaged in "paper" transactions of inventory between subsidiaries. Both of these actions falsely inflated the amount of collateral that CBI or a particular subsidiary had available, thus increasing the amount of money the entity could borrow from the bank syndicate.

E&Y conducted the Audits in accordance with Generally Accepted Accounting Standards ("GAAS") and that, in the opinion of E&Y, the consolidated financial statements presented fairly, in all material respects, the financial position of CBI.  In fact, the financial statements did not fairly present CBI's financial condition, because E&Y failed to detect the disguised, unrecorded liabilities when it performed the Audits.

   a. <u>E&Y's preparation for the Audits</u>

   Prior to commencing each Audit, E&Y prepared a document entitled "Assessment of Control Environment."  The document stated that: (1) CBI's management was dominated by its CEO and V.P. of Finance; (2) management's attitude toward valuing accounts was aggressive; (3) duties in the accounting department were not segregated; (4) the company's largest debt agreement included stringent financial convenants, which could influence management's philosophy and attitudes towards estimates; and (5) CBI had no internal audit function.  The assessment also noted some positive factors about CBI's control environment.  Overall, however, E&Y assessed CBI's control environment as "ineffective."

   E&Y completed several other audit planning forms each year (the "Audit Plans").  The Audit Plans noted that CBI was a "close monitoring" engagement, meaning that there was a significant chance that E&Y would suffer monetary or reputational damage as a

result of the Audits.  The Audit Plans designated the CBI accounts payable department as "high risk."

E&Y's Audit Plans also laid out the steps E&Y planned to take with respect to auditing each area of CBI's operations.  For the accounts payable department, the Audit Plans stated that, among other steps, E&Y would perform a search for unrecorded liabilities.  A search for unrecorded liabilities involves reviewing records of all payments made by a company for a period of time after the end of the fiscal year, and, for all such payments made over a specified amount, examining corresponding documentation.

The purpose of a search for unrecorded liabilities is to determine whether or not the goods or services paid for were received as of the end of the fiscal year under audit.  If the goods or services were received prior to year end, the auditor is required to ascertain whether the liability was properly recorded for that year.  If liabilities are not properly recorded, the company's earnings will be falsely inflated.

The Audit Plans also stated that, during the Audits, E&Y would carry out "vendor reconciliations" for accounts payable. For this step, E&Y intended to obtain copies of vendor statements from the last date of the fiscal year for, in 1992, CBI's five largest vendors, and, in 1993, its 10 largest vendors.  E&Y would

8

then reconcile these statements against the account payable balances for those vendors, as recorded in CBI's books. The Bankruptcy Court found that at least one purpose of performing vendor reconciliations was to test for unrecorded liabilities.[8]

### b.  Conducting the Audits

In 1992, the Audit detected $292,000 unrecorded liabilities on CBI's books, but failed to detect an additional $1.82 million of such liabilities. In 1993, the Audit found $1.4 million in unrecorded liabilities, but missed an additional $7.5 million.

In conducting the Audits, E&Y performed a search for unrecorded liabilities. During the searches, E&Y observed the advance payment notations in CBI's books. E&Y asked CBI's management for an explanation of the advance notations, and was told that these were payments made to reduce credit balances with vendors. E&Y did not take any independent steps to verify this

_____

[8] On appeal, E&Y contests the Bankruptcy Court's finding that the vendor reconciliations were intended to search for unrecorded liabilities. E&Y argues that it conducted reconciliations in order to verify CBI's accounting for vendor credits and chargebacks. (Def. Br. at 67.) Vendor credits are credits given to distributors as a result of pricing disputes, sales returns, and vendor promotion items. Chargebacks are three-party transactions, allegedly common in the pharmaceutical industry, whereby the distributor agrees to charge a vendor's preferred customer a low price for a product and then "charge back" to the vendor the difference between the normal wholesale price and the preferential price.

explanation.[9]

In addition, E&Y did not analyze advance payments during the search for unrecorded liabilities.[10]  The Bankruptcy Court found that, if E&Y had analyzed the advance payments, it would have discovered the additional unrecorded liabilities.

With respect to vendor reconciliations, E&Y conducted reconciliations on five of CBI's vendors in 1992, and ten of its vendors in 1993, but not on its five and ten largest vendors, as E&Y had planned.  The Bankruptcy Court found that if in 1993 E&Y had performed the vendor reconciliations as planned, it would have discovered additional unrecorded liabilities.

During the 1993 Audit, Scerra, E&Y's lead auditor, also learned that Castello had taken his bonus early and that his bonus was calculated based on of falsely inflated earnings.[11]

---

[9]  The Bankruptcy Court noted a number of steps E&Y could have taken to verify CBI's explanation of the advance payments, including checking if the vendor actually had a credit limit with CBI, the amount of that credit limit, the vendor's account payable balance, and to which invoices CBI or the vendor applied the advance payment.  CBI I, 247 B.R. at 350-51.

[10]  This means that, when an advance payment fell within the scope of the search for unrecorded liabilities, E&Y did not determine when CBI received the merchandise paid for by the advance payment, whether CBI should have recorded liabilities for such payments for the fiscal year under audit, and whether any such liabilities were in fact were recorded.

[11]  When Scerra learned of Castello's bonus, E&Y had discovered the $1.4 million of unrecorded liabilities during the 1993 Audit.  Because these liabilities had not been recorded when

Scerra did not include the bonus information in the 1993 Audit Report, however.  On internal documents, Scerra noted that Castello placed "undue influence" on earnings, which he marked as a red flag.

### c.  Events following the 1993 Audit

In early November 1993, Steve Young ("Young"), who had been hired to be CBI's Chief Financial Officer, left the job after only eight days.  Before leaving, Young alleged that there was $3-4 million of "grey accounting" on CBI's books.  Scerra told Castello that he was interested in speaking with Young, but he did not actually do so until March 1994, at which point Young confirmed that CBI had $5-6 million of unrecorded liabilities at the end of the 1993 fiscal year (by March 1994, E&Y had also discovered these unrecorded liabilities).

During December 1993 and January 1994, E&Y had meetings to discuss whether it should continue its relationship with CBI.  The E&Y partners in attendance, including Scerra, discussed a number of "red flags" with respect to CBI, including E&Y's

───────────────

Castello took his bonus, Castello's bonus was based on inflated earnings, a fact which Scerra knew.  Of course, because of the additional unrecorded liabilities that E&Y did not detect, CBI's earnings were inflated by more than $1.4 million.  The Bankruptcy Court did not find that Scerra was aware of this additional inflation, and there is no evidence on the record to support such a finding.

11

evaluation that CBI's management placed undue influence on earnings, aggressive accounting at CBI, and Young's allegations. It was Scerra's opinion that the CBI engagement was too risky for E&Y, but E&Y decided to continue the engagement.

### d. Discovery of the fraud

In early February 1994, the former controller of CBI's Granain subsidiary revealed to an E&Y auditor that there had been significant unrecorded liabilities at Granain, which had been disguised as "advances."

In response to the allegations, E&Y's auditing team for the Audits reviewed the work they had done during the 1993 search for unrecorded liabilities.  They saw that E&Y had noted the advance payments but had not conducted the search for unrecorded liabilities on them.  E&Y then began an investigation into the Granain allegations.

On March 8, 1994, while E&Y was investigating Granain, CBI's controller told Scerra that there were $6-7 million disguised, unrecorded liabilities at CBI.  E&Y began a broader investigation and quickly uncovered $5 million in unrecorded liabilities.

On March 12, 1994, E&Y informed CBI's Board of Directors that E&Y had withdrawn its reports with respect to CBI's 1993 financial statements, and that the reports could no longer be relied upon.

Following the revelation of the unrecorded liabilities, TCW exercised its right to take control of CBI. Castello remained at CBI as Chief Operating Officer, but a TCW official, Frank Pados ("Pados") was brought in to oversee the company. TCW hired E&Y to conduct the Re-Audit. When E&Y accepted the assignment, it did not inform TCW that its auditors had noted the advance payments during the 1993 Audit, but had not analyzed them during the search for unrecorded liabilities.

### e. CBI's bankruptcy

While E&Y was conducting the Re-Audit, CBI's financial situation began to worsen. In the spring of 1994, CBI sought a recapitalization from its bank syndicate. One bank in the syndicate would not commit to the recapitalization. In the meantime, CBI began having trouble making timely payments to its vendors. In turn, CBI's vendors began tightening their credit terms with CBI and reducing shipments. As a result, CBI's inventory shrank, it had trouble filling orders, and its customers began moving to other suppliers. This further reduced CBI's cash flow and made it even harder for the company to make payments to vendors. CBI's financial situation began to spiral downward.

In June 1994, FoxMeyer, a company engaged in the wholesale pharmaceutical business, indicated that it was interested in

purchasing CBI.  FoxMeyer estimated that CBI was worth $142 million.  FoxMeyer withdrew its proposal later that month.

In July 1994, Pados informed E&Y that it could cease the Re-Audit, because CBI was on the verge of collapse.  Later that month, CBI filed for Chapter 11 bankruptcy.

C.  Procedural History

In 1996, Plaintiff brought this action on behalf of CBI and TCW against E&Y, alleging that E&Y committed malpractice and fraud during the Audits.  In 2000, after a seventeen-day bench trial, the Bankruptcy Court granted judgment in favor of Plaintiff.  E&Y appealed the Bankruptcy Court's ruling to this Court.  In 2004, the Court vacated the Bankruptcy Court's judgments.

The parties appealed the Court's ruling to the Second Circuit, and E&Y cross-appealed.  In 2008, the Second Circuit affirmed the Court's decision in part, reversed in part, and remanded the case to the Court for further proceedings.

On remand, the Court must resolve three issues related to the CBI Claims: (1) whether there was sufficient legal and factual basis for the Bankruptcy Court's ruling that E&Y committed malpractice and fraud in performing the Audits; (2) whether the Bankruptcy Court erred in ruling that E&Y's conduct caused CBI's injury; and (3) whether the Bankruptcy Court erred

14

in calculating the damages E&Y owed on the CBI Claims.

For the reasons set forth below, the Court holds that: (1) there was a sufficient legal and factual basis for the Bankruptcy Court's ruling that E&Y committed malpractice, but not for its ruling that E&Y committed fraud; (2) the Bankruptcy Court did not err in ruling that E&Y's conduct caused injury to CBI; and (3) further proceedings are necessary in the Bankruptcy Court with respect to the damages awarded against E&Y.

II.  <u>Analysis</u>

A.  <u>Standard of Review</u>

The Court reviews the Bankruptcy Court's conclusions of law *de novo*. <u>Buena Visa Home Ent. Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.)</u>, 386 B.R. 428, 435 (S.D.N.Y. 2008).

The Court reviews the Bankruptcy Court's factual findings for clear error. <u>Ades & Berg Group Investors v. Breeden (In re Ades & Berg Group Investors)</u>, 550 F.3d 240, 243 n.4 (2d Cir. 2008). "In reviewing findings for clear error, [an appellate court] is not allowed to second-guess . . . the trial court's . . . choice between competing inferences. Even if the appellate court might have weighed the evidence differently, it may not overturn findings that are not clearly erroneous." <u>CBI II</u>, 529 F.3d at 449(internal quotations omitted).

The Bankruptcy Court's rulings on the credibility of

15

witnesses at trial and its rulings excluding or admitting expert testimony are reviewed under an abuse of discretion standard. Universal Church v. Geltzer, 463 F.3d 218, 226 (2d Cir. 2006); BIC Corp. v. Far E. Source Corp., 23 Fed. Appx. 36, 38-39 (2d Cir. 2001).

B.   The Bankruptcy Court's Ruling on Malpractice & Fraud

For the reasons set forth below, the Court holds that (1) the Bankruptcy Court did not commit clear error in ruling E&Y committed malpractice; and (2) the Bankruptcy Court did commit clear error in ruling that E&Y committed fraud.

1.   Malpractice

a.   Legal standard

To prevail on a claim under New York law for auditor malpractice, a plaintiff must establish (1) that there was a departure from accepted standards of practice; and (2) that the departure was a proximate cause of injury.  See Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15 (2d Cir. 2000); In re Allou Distributors, 395 B.R. 246, 259 (E.D.N.Y. Bankr. Ct. 2008).

GAAS sets forth the accepted standards of practice for auditors.  United States v. Arthur Young & Co., 465 U.S. 805, 811 (1984).  An accountant's good faith compliance with GAAS and generally accepted accounting principles ("GAAP") discharges the

16

accountant's professional obligation to act with reasonable care.
Mishkin v. Peat, Marwick, Mitchell & Co., 744 F. Supp. 531, 538
(S.D.N.Y. 1990) (auditor undertakes duty "to exercise good faith
and to observe [GAAS] . . . with the appropriate reasonable,
honest judgment that a reasonably skillful and prudent auditor
would use under the same or similar circumstances."). A court
must evaluate an auditor's alleged deviations from GAAS on the
basis of what the auditor knew at the time of the audit, and not
on the basis of hindsight. See Ultramares Corp. v. Touche, 174
N.E. 441, 444 (N.Y. 1931) (Cardozo, J.) ("No doubt the wisdom
that is born after the event will engender suspicion and
distrust.").

b.  The Bankruptcy Court's findings

The Bankruptcy Court found that E&Y committed malpractice
because its conduct during the Audits violated the following
sections of GAAS: (1) AU § 220, which requires that an auditor
maintain an independence in mental attitude during an audit; (2)
AU § 230, which requires due professional care during the
performance of an audit; (3) AU § 326, which requires an auditor
to obtain sufficient evidence to afford a reasonable basis for
its opinion; and (4) AU §§ 410, 431, and 500, which require that
the financial statements subject to audit be presented in
accordance with GAAP. CBI I, 247 B.R. at 363.

17

The Bankruptcy Court found that E&Y's conduct of the Audits
violated the specified provisions of GAAS because E&Y: (1) failed
to conduct the search for unrecorded liabilities on the advance
payments; (2) failed to independently verify CBI's explanation of
the advance payments; (3) failed to conduct vendor
reconciliations on CBI's largest vendors; and (4) signed the 1993
Audit opinion, even though E&Y knew of Castello's improper
conduct with respect to his 1993 bonus.  In addition, the
Bankruptcy Court found that two incidents indicated that E&Y
lacked independence with respect to CBI:  (1) Scerra's failure to
speak with Young until five months after his departure; and (2)
E&Y's decision to continue its engagement with CBI despite red
flags.  Id. at 349-58.

The Bankruptcy Court also found that E&Y committed
malpractice when it agreed to conduct the Re-Audit.  The
Bankruptcy Court found that when E&Y accepted the assignment, it
knew that it had not conducted the 1993 Audit in accordance with
GAAS (because E&Y was aware that it had not completed the search
for unrecorded liabilities on the advance payments), and that CBI
could sue E&Y for malpractice.  Therefore, E&Y committed
malpractice by accepting an assignment from a client with whom
E&Y was likely to be in an adversarial position.  Id. at 357.

Finally, the Bankruptcy Court found that E&Y violated GAAS

AU § 316, which requires an auditor to design an audit to provide reasonable assurance of detecting errors and irregularities in the financial statements.  The Bankruptcy Court held that, once an auditor has prepared an audit plan, the auditor's failure to carry out that plan constitutes a deviation from GAAS AU § 316. Id. at 363.  Because E&Y failed to conduct vendor reconciliations and the search for unrecorded liabilities in accordance with the Audit Plans, it violated GAAS AU § 316.  Id.

c.  Review of the Bankruptcy Court's findings

E&Y argues that the Court should set aside the Bankruptcy Court's ruling because: (1) the Bankruptcy Court's factual findings are clearly erroneous; (2) the Bankruptcy Court based its ruling on hindsight; and (3) the Bankruptcy Court incorrectly held that E&Y's deviations from its Audit Plans constituted malpractice.[12]  The Court considers each of these arguments in

---

[12] E&Y also argues that the Court should overturn the Bankruptcy Court's ruling on the grounds that the Bankruptcy Court refused to take into account sections of GAAS that (1) acknowledge that an auditor's failure to find a misstatement does not necessarily indicate malpractice, and (2) identify circumstances, such as widespread collusion and concealment, that make it more difficult for an auditor to discover fraud or misconduct. See GAAS AU § 316.
    The Court agrees with E&Y that an audit can comply with GAAS even if the auditor fails to discover a material misstatement, and that courts should take into consideration the circumstances surrounding the audit when determining whether the auditor committed malpractice.  However, a court is not obligated to find that the existence of a fraud negates a claim for malpractice.

turn, and holds that the Bankruptcy Court had sufficient legal and factual basis for its ruling that E&Y committed malpractice.

First, the Bankruptcy Court did not commit clear error in finding that E&Y's conduct of the Audit constituted malpractice. The Bankruptcy Court correctly held that E&Y was required to comply with GAAS when performing the Audits. Id. at 362.  It found that E&Y's conduct of the Audits violated GAAS AU §§ 220, 230, 326, 410, 431, and 500.  Id. at 363.  This finding was not clearly erroneous.

It is undisputed that, during the Audits and Re-Audit, E&Y did not: (1) verify the advance payment explanation, conduct the search for unrecorded liabilities on the advance payments, or carry out additional vendor reconciliations to supplement the search for unrecorded liabilities;[13] (2) inform CBI or TCW of the

---

Here, the Bankruptcy Court made detailed factual findings regarding how E&Y's conduct constituted malpractice.  The Bankruptcy Court was not required to set aside its findings because the fraud taking place at CBI may have made it more difficult for E&Y to complete the Audits.  Nor is it clear from the record that the existence of fraud at CBI impeded E&Y's work to such an extent that the Bankruptcy Court's findings were clearly erroneous.

[13]   The Bankruptcy Court found that one purpose of vendor reconciliations was to search for unrecorded liabilities, and that E&Y failed to carry out sufficient reconciliations to fulfill this purpose.  The Bankruptcy Court based this finding largely on the testimony of Plaintiff's expert, Robert Rock.
On appeal, E&Y claims that the record "overwhelmingly show[s]" that vendor reconciliations were intended to verify CBI's accounting for vendor credits and chargebacks, and that E&Y

issues regarding Castello's bonus, which E&Y deemed a "red flag"; (3) speak to Young until to March 1994, five months after Scerra first learned of Young's accounting allegations; (4) discontinue the CBI engagement due to the red flags raised during the Audits; and (5) inform TCW of E&Y's failures with respect to the 1993 Audit prior to taking the Re-Audit assignment.  It is also undisputed that, at the time of the Audits and Re-Audit, E&Y was aware of red flags indicating that CBI had weak controls in certain areas of its operations, including its accounts payable department.  Further, Plaintiff's expert witness testified that E&Y's conduct of the Audits constituted malpractice.[14]

---

clearly carried out more than enough vendor reconciliations to discharge its duties to verify such accounting.  (App. Br. p. 67 n.38.) The overwhelming evidence that E&Y points to, however, is the testimony of Scerra and E&Y's expert witness, Gerald Ward. The Bankruptcy Court specifically found that Scerra's and Ward's testimony lacked credibility.  There is no evidence that the Bankruptcy Court abused its discretion in making these credibility determinations.  Thus, its findings based on these determinations are not clearly erroneous.  See CBI II, 529 F.3d at 449-50 ("'[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two . . . witnesses . . . that finding, if not internally inconsistent, can virtually never be clear error.'")(quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575).

[14]  Defendant's expert witness, Gerald Ward ("Ward"), testified that E&Y's conduct did not constitute malpractice.  The Bankruptcy Court found that Ward was not credible, and thus gave less weight to his testimony.  According to the Bankruptcy Court, at trial Ward did not respond to questions propounded and contradicted his own testimony.  The Bankruptcy Court's ruling was not an abuse of discretion.

The Bankruptcy Courts's ruling that E&Y committed malpractice by failing to take the actions specified by the Bankruptcy Court was not clearly erroneous, particularly considering the red flags and the testimony of Plaintiff's expert witness.

Second, the Bankruptcy Court did not base its ruling on hindsight. As just discussed, the Bankruptcy Court's ruling is based on what E&Y knew at the time of the Audits.

Finally, the Bankruptcy Court did err in ruling that E&Y's deviation from the Audit Plans violated GAAS AU § 316. CBI I, 247 B.R. at 363. GAAS AU § 316 simply states that an auditor should plan and perform an audit to obtain reasonable assurance that financial statements are free of material misstatements; it does not state that an auditor must carry out an audit precisely as planned.[15] GAAS AU § 316.12. Thus, E&Y's failure to follow the Audit Plans was not malpractice. Nonetheless, the Bankruptcy Court's findings that E&Y's conduct of the Audits violated GAAS

---

[15] GAAS provides broad standards of conduct with which an auditor must comply. There are different, specific actions that an auditor might take to discharge its duties with regard to a particular audit. The fact that an auditor plans to perform certain actions does not mean that those actions, and those actions alone, will result in an audit that complies with GAAS. GAAS AU § 316 obligates an auditor to take care in planning an audit. To determine whether that auditor then committed malpractice in performing the audit, the Court must look at whether the audit, as performed, deviated from GAAS.

are sufficient to support its ruling on malpractice.

Accordingly, the Court AFFIRMS the Bankruptcy Court's ruling that E&Y's committed malpractice in conducting the Audits.

2. <u>Fraud</u>

The Bankruptcy Court committed clear error in ruling that E&Y's conduct during the Audits constituted fraud.

1. <u>Legal standard</u>

To succeed on a claim for fraud, a plaintiff must prove either (1) that the defendant acted with an intent to defraud, <u>SEC v. Price Waterhouse</u>, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992); or (2) that the defendant's conduct was so grossly negligent or reckless that the conduct "approximates an actual intent to aid in the fraud being perpetrated by the audited company." <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 657-58 (S.D.N.Y. 2007).[16]

To prove that an auditor's conduct was sufficiently reckless to constitute fraud, a plaintiff must show "more than a misapplication of accounting principles . . . . [The conduct] must be so deficient that the audit amounted to no audit at all,

---

[16] Most of the cases cited in this section address fraud in the context of the federal securities laws. The elements of common law fraud, however, are essentially the same as those of fraud under § 10(b) and Rule 10b-5, and courts apply the same analysis to both types of cases. <u>Ellison v. Am. Image Motor Co., Inc.</u>, 36 F. Supp. 2d 628, 639 (S.D.N.Y. 1999).

or an egregious refusal to see the obvious or investigate the
doubtful," Price Waterhouse, 797 F. Supp. at 1240; see also In re
Leslie Fay Cos., Inc. Sec. Litig., 835 F. Supp. 167, 173
(S.D.N.Y. 1993) (finding that for outside auditor to be held
liable in fraud its conduct must be "deliberate or so reckless
that an inference of fraudulent intent might be drawn").  This
Court has previously found that reckless conduct constitutes
fraud only where a defendant "deliberately refrained from taking
steps to discover whether [its] statements were false or
misleading."  In re Fischbach Corp. Sec. Litig., 1992 WL 8715
(S.D.N.Y. Jan. 15, 1992) (KMW); In re Leslie Fay Cos., Inc. Sec.
Litig., 835 F. Supp. at 173 (applying reasoning in In re
Fischbach Corp. Sec. Litig. to a fraud claim against an auditor).

Courts in this Circuit have allowed plaintiffs to pursue
fraud claims against auditors on the basis of recklessness, where
plaintiffs have shown that (1) the auditor was aware of
transactions that were part of a fraudulent scheme; and (2) the
auditor knew or had reason to know that the transactions were
suspect, but failed to investigate them.  See In re Refco, Inc.
Sec. Litig., 503 F. Supp. 2d at 658-59 (finding that plaintiffs
had sufficiently alleged fraud by auditor by alleging that
auditor was aware of large transactions that had disappeared from
the company's books, where the transactions were part of the

24

fraud and the auditor knew the transactions were suspicious);
Fidelity & Deposit Co. of Maryland v. Arthur Anderson & Co., 131
A.D.2d 308 (1st Dept. 1987) (finding that plaintiff had stated a
cause of action for fraud by alleging that auditor had recognized
as revenue a claim for payment that the auditor knew the company
had never submitted for payment); see also Vladimir v. Deloitte &
Touche LLP, No. 95 Civ. 10319, 1997 WL 151330, at *6-7 (S.D.N.Y.
Mar. 31, 2007) (stating that allegations that auditor was aware
of fraudulent purpose of un-investigated transactions would be
sufficient to state a claim for fraud).  Courts have also
permitted claims to go forward where plaintiffs have sufficiently
alleged that an auditor had access to documents that provided
details about the fraudulent scheme.  See In re Refco, 503
F.Supp.2d at 658-59.

Where an auditor was not aware of facts indicating that a
transaction was suspicious or part of a fraud, the auditor's
failure to investigate the transaction – even if negligent –
does not provide a basis for a fraud claim.  See Rothman v.
Gregor, 220 F. 3d 81, 98 (2d Cir. 2000) (finding that auditor's
failure to investigate transactions did not provide basis for a
fraud claim where the auditor was not aware of facts indicating
that company was improperly including transactions in its sales
data); In re Refco, 503 F. Supp. 2d at 658-59 (finding that

allegation that auditor failed to request more information about certain transactions could not sustain a claim for fraud absent an allegation that the auditor knew that the company was improperly recording the transactions); <u>Vladimir</u>, 1997 WL 151330, at *6 (finding that auditor's failure to investigate company's controls on new foreign customers could not sustain a claim of fraud where the auditor did not know or have reason to know that the company's controls were inadequate).

### 2.    Bankruptcy Court's findings

The Bankruptcy Court ruled that E&Y committed fraud because E&Y's failure to investigate the advance payments constituted reckless or grossly negligence conduct sufficient to sustain a fraud claim. <u>CBI I</u>, 247 B.R. at 367.  The Bankruptcy Court pointed to no other aspect of E&Y's conduct to support its fraud ruling.

### 3.    Review of the Bankruptcy Court's findings

The Bankruptcy Court's ruling that E&Y committed fraud by failing to verify the advance payments was clearly erroneous. While the Bankruptcy Court found that E&Y was aware of some general red flags with respect to CBI, it did not find that the advance payments themselves were a red flag, or that E&Y knew or suspected that the advance payments were used to hide

liabilities.[17]  The Bankruptcy Court had grounds for finding that E&Y was negligent in not verifying the explanation of the advance payments, given the control weaknesses at CBI and E&Y's general duties under GAAS.  Absent evidence that the advance payments were suspicious or that E&Y knew or had reason to know that CBI was improperly recording the payments, however, the Bankruptcy Court erred in finding that E&Y's failure to investigate the payments was not so reckless as to constitute a conscious attempt to avoid discovering the fraud.

There is no other evidence on the record to support a finding of fraud against E&Y.  The red flags of which E&Y was aware did not indicate that CBI's management was disguising liabilities or reveal any other details of the fraud.  Thus, any inadequacies in E&Y's response to the red flags were not so reckless as to constitute an intent to aid the fraud.

Moreover, the record indicates that, while E&Y's audit of

---

[17]  The Bankruptcy Court found that during the 2003 Audit, many of the advance payments fell within the scope of E&Y's search for unrecorded liabilities, and that some advance payments appeared to be connected to specific purchase orders, which E&Y could have verified during the search.  See CBI I, 247 B.R. at 353-54.  These facts did not indicate that the advance payments were fraudulent.  A payment was not suspicious simply because it needed to be analyzed during the search for unrecorded liabilities.  The Bankruptcy Court's findings support a ruling that E&Y was negligent in not conducting a more thorough search for unrecorded liabilities, but not that it actively disregarded the fraud.

CBI's accounts payable department was deficient, the Audits as a whole were still fairly robust. It is undisputed that E&Y uncovered a large number of unrecorded liabilities, even if it missed those disguised as advance payments. It also conducted sufficient vendor reconciliations to verify other aspects of CBI's accounting, such as CBI's accounting of vendor credits and chargebacks. No allegations have been made that the Audits were deficient outside of the accounts payable department. In addition, E&Y made efforts to follow up on accusations of fraud by CBI personnel. Scerra made several attempts to speak with Young, although he failed to do so until after the unrecorded liabilities were revealed. And E&Y's auditing team quickly began an investigation into the allegations regarding fraud at the Grainan subsidiary. This evidence undercuts a finding that E&Y's conduct of the Audits was so deficient that it was fraudulent. See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 657-58 (stating that an audit must be so deficient as to amount to no audit at all or an egregious refusal to investigate).

The Bankruptcy Court clearly erred in finding that E&Y's conduct of the Audits was so reckless that it constituted fraud. Accordingly, the Bankruptcy Court's ruling that E&Y committed fraud is REVERSED.

C.  <u>Loss Causation</u>

The Court holds that there was sufficient evidence on the record to support the Bankruptcy Court's finding that E&Y's conduct caused injury to CBI.

1.  <u>Legal Standard</u>

Under New York law, a plaintiff cannot succeed on a claim of malpractice unless he can prove loss causation.  To establish loss causation, the plaintiff must prove (1) that the defendant's malpractice actually caused the plaintiff's injury; and (2) that the injury was a foreseeable consequence of the malpractice.  <u>AUSA v. Ernst & Young</u>, 206 F.3d 202, 210 (2d Cir. 2000); <u>In re Vivendi Universal, S.A. Sec. Litig.</u>, 605 F. Supp. 2d 586, 595 (S.D.N.Y. 2009) ("Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff").  Where the wrongful act is a "failure to perform a duty and performance of the duty would have prevented the harm, causation is established at least where the harm was reasonably foreseeable in the event of a dereliction." <u>Bernstein v. Crazy Eddie, Inc.</u>, 702 F. Supp. 962, 986 (E.D.N.Y. 1988).  To prove loss causation, a plaintiff does not need to prove that "the liable party [was] the sole cause of harm," but only "that the identified cause be a substantial factor in bringing about the injury." <u>Hydro Investors v. Trafalgar Power Inc.</u>, 227 F.3d 8, 15

29

(2d Cir. 2000).

### 2. Bankruptcy Court's findings

_____The Bankruptcy Court found that if E&Y had found the unrecorded liabilities during the Audits or reported that Castello had taken his bonus improperly, TCW would have taken control of CBI and either sold the company or put in additional controls. CBI I, 247 B.R. at 364. According to the Bankruptcy Court, such action would have prevented CBI's injury.[18] Id.

### 3. Review of the Bankruptcy Court's finding

The Court holds that the Bankruptcy Court did not clearly err in finding that E&Y's malpractice caused CBI's injury by preventing TCW from taking over and possibly selling CBI.

E&Y claims that there was no evidence on the record to support the Bankruptcy Court's finding that a take-over and possible sale of CBI by TCW would have prevented CBI's injury. According to E&Y, CBI went bankrupt because it was unable to make

---

[18] The Bankruptcy Court made a second finding regarding loss causation. The Bankruptcy Court found that E&Y's conduct caused CBI's injury because E&Y's withdrawal of its 1993 Audit Report (the "Audit Report") caused CBI's vendors to restrict the amount of credit available to CBI, which in turn caused CBI's sales revenues to decline and resulted in the company's bankruptcy. CBI I, 247 B.R. at 364. E&Y appeals this ruling, and argues that other factors, not E&Y's withdrawal of the Audit Report, caused CBI's vendors to restrict credit. Because the Court upholds the Bankruptcy Court's first finding establishing loss causation, the Court does not address this second finding.

timely payments to its vendors, which caused the vendors to restrict their credit limits with CBI and reduce shipments, which, in turn, caused CBI's customers to move their business to other suppliers.  E&Y argues that Plaintiff presented no evidence that these events would not have taken place if TCW had taken over and possibly sold CBI.

The Court holds that there was sufficient evidence on the record to support the Bankruptcy Court's ruling.  The injury suffered by CBI was the company's total loss of value caused by its bankruptcy.  At trial, Pados testified that if TCW had known of CBI's true financial condition and the fraudulent scheme in October 1993 or earlier, it would have taken control of CBI at a point when it was still profitable, changed the management, and focused on preserving the company's value.  (Tr. Trans. 1388-91.) Pados testified that if such actions had been taken, CBI would not have collapsed.  (Tr. Trans. 1391.)

Rock, Plaintiff's expert witness, testified in his expert report and at trial that, if TCW had known that CBI's management was falsely inflating earnings, TCW would have ceased CBI's acquisition strategy, sought to preserve the company's value, and potentially sold the company. (PX 19; Tr. Trans. 2356-57.)  Rock also stated that, if CBI's true financial condition had been known, CBI would not have pursued a public debt offering, which

caused it to incur significant expenses and liabilities, and put additional financial pressure on the company at a time when it was already highly leveraged.  (PX 19.)  According to Rock, TCW's alternative strategy would have prevented the injury to CBI.  (PX 19; Tr. Trans. 2356-57.)

In his expert report, Rock stated that the sale of CBI during 1992 and 1993 would have been feasible, and that a sale would have preserved CBI's value.  (PX 19.)  In addition, evidence was presented at trial that between October 1993 and March 1994, CBI had a value of 18-24% of revenues, and that, in June 1994, the company could have been sold for 22% of revenues. CBI I, 27 B.R. at 361.

The evidence presented provided sufficient basis for the Bankruptcy Court's ruling that a take-over and potential sale of CBI by TCW would have prevented CBI's total loss of value through bankruptcy.  Rock's testimony and the evidence presented on CBI's value in late 1993 and early 1994, support the Bankruptcy Court's conclusion that a sale of the company would have preserved CBI's value.  Moreover, it is not unreasonable to conclude that CBI would have been in a stronger financial position and able to withstand other business pressures, if TCW had changed the company's management, ceased its acquisition strategy, not pursued the public debt offering, and focused on preserving CBI's

value.  The Bankruptcy Court did not clearly err in finding that
E&Y's conduct caused CBI's injury.  Accordingly, the Bankruptcy
Court's holding that E&Y's conduct caused CBI's injury is
AFFIRMED.

    D.  <u>Damages</u>

The Court holds that further proceedings are necessary in
the Bankruptcy Court with respect to the damages awarded against
E&Y.

    1.  <u>The Bankruptcy Court's findings</u>

Following the liability phase of the trial (the "Liability
Trial"), the Bankruptcy Court held a separate two-day trial on
damages (the "Damages Trial").  Calculating CBI's damages
required determining the difference between the value of CBI's
equity in 1993 and $0, CBI's value after its bankruptcy.
(Bankruptcy Court's Damages Opinion, dated October 23, 2000, ¶ 2
[hereinafter Damages Opinion].)

At the Damages Trial, each party called an expert witness to
testify as to CBI's value prior to its bankruptcy, and the
damages it suffered as a result of CBI's conduct.  Plaintiff
called Rock, who had testified during the Liability Trial, and
Defendants called Steven Wiggins ("Wiggins").  The Bankruptcy
Court found that Rock was qualified under Federal Rules of
Evidence Rule 702 to testify as an expert on CBI's valuation and

damages.  (Damages Opinion, ¶ 5.)

The Bankruptcy Court found that Wiggins was not qualified pursuant to Rule 702 to testify as an expert on CBI's value and the damages the company incurred.  (Damages Opinion, ¶ 6.)  The Bankruptcy Court found that Wiggins' proposed testimony did not conform to the Bankruptcy Court's findings of fact regarding CBI's value.  Wiggins proposed to testify that CBI had a negative net value in 1993.  Id.  During the Liability Trial, the Bankruptcy Court already had found that CBI would have sold for a substantial value in 1993.  Id.  Therefore, the Bankruptcy Court held that Wiggins' testimony would not assist it in understanding the evidence or determining the facts, as Rule 702 requires of expert testimony.  Id.  The Bankruptcy Court also found inconsistencies in Wiggins' testimony that supported its decision not to permit him to testify on valuation and damages.  (Damages Opinion, ¶¶ 36-40.)  The Court did permit Wiggins to testify on the correct methodology for valuing CBI's equity.  (Damages Opinion, ¶ 7.)

At the Damages Trial, both experts testified that a proper methodology for valuing CBI was the market comparison approach, which involves calculating a company's value by reference to the values of other similar public companies.  (Damages Opinion, ¶ 8.)  The Bankruptcy Court agreed that the market comparison

approach was an appropriate valuation method.  Id.

To determine the value of CBI's equity in 1993, the Bankruptcy Court: (1) calculated the company's enterprise value as of April 30, 1993 (the end of the fiscal year); and (2) deducted the company's short-term and long-term debt as of that date. (Damages Opinion, ¶ 10.)

To calculate CBI's enterprise value, the Bankruptcy Court multiplied CBI's net sales as of April 30, 1993 by a sales multiple.  (Damages Opinion, ¶ 9.)  The Bankruptcy Court used a sales multiple of 22%, which was the multiple that FoxMeyer used to calculate CBI's value for its 1993 purchase proposal.[19] (Damages Opinion, ¶ 15.)  For net sales, the Bankruptcy Court took CBI's net sales for the fiscal year ending April 30, 1993, and added $90 million to account for all of the annualized sales of M. Brenner (the "M. Brenner Sales"), a subsidiary that CBI acquired on April 15, 1993.[20] (Damages Opinion, ¶ 25.)

----

[19]  At trial, Rock testified that the appropriate sales multiple for CBI was 24%.  Wiggins testified that Rock's 24% figure was based on an incorrect application of the market comparison approach, and that the correct multiple was 18%.  The Bankruptcy Court disregarded both experts' testimony in making its determination.

[20]  The Bankruptcy Court added all of M. Brenner's sales, even though M. Brenner was acquired only two weeks before the end of the fiscal year, because it also deducted M. Brenner's long-term bank debt during the second step of the equity value calculation, and deducting the debt without including the sales would produce a distorted calculation.  (Damages Opinion, ¶ 25.)

After making the necessary calculations, the Bankruptcy
Court found that the value of CBI's equity in 1993 was
$27,738,603. (Damages Opinion, ¶ 27.) Given that CBI's value
after bankruptcy was $0, $27,738,603 was also the amount of
damages CBI suffered as a result of its collapse (the "Damage
Award"). (Bankruptcy Court Judgment, dated November 6, 2000.)

The Bankruptcy Court found that E&Y was liable to CBI for
the entire Damage Award. E&Y argued that the Damage Award should
be reduced under New York's comparative negligence statute by the
amount that the fraud carried out by CBI's management contributed
to CBI's bankruptcy. The Bankruptcy Court did not explicitly
address comparative negligence in its decision, but it did not
reduce the Damage Award under the comparative negligence statute.

E&Y also argued that the Damage Award should be reduced
under New York General Obligations Law § 15-108(a), to reflect
two settlements CBI's Creditors Committee (the "Committee")
entered into following CBI's bankruptcy. First, the Committee
entered into a settlement with TCW (the "TCW Settlement"),
whereby the Committee released all claims it had against TCW
related to CBI's bankruptcy. (DX 502 & 503.) In exchange, TCW

---

Rock testified that this was the correct approach. (Damages
Opinion, ¶ 12.) Wiggins testified that including the entire $90
million of M. Brenner's sales was improper under the market
comparison methodology. (Damages Opinion, ¶ 15.)

(1) waived its rights to receive distributions under CBI's
Bankruptcy Plan until certain other creditors had been paid, and
(2) assigned any claims TCW held against any third parties to the
Committee. (DX 503.)  The settlement agreement did not specify
precisely what types of claims the Committee believed it could
bring against TCW.  However, in its first disclosure statement to
creditors, the Committee explained that it had entered into the
settlement after determining that it could bring claims against
TCW officials who sat in CBI's Board, based on the decisions they
made in their capacity as Board members.[21]  (DX 503.)

Second, the Committee entered into a settlement agreement
with Paul Rogers ("Rogers") (the "Rogers Settlement"), a member
of CBI's management who participated in the fraud.  (DX 505.)
The Committee released all claims it had against Rogers in
exchange for Rogers cooperating in any litigation the Committee
brought related to the fraud.

The Bankruptcy Court did not reduce the Damage Award to

---

[21]  The disclosure statement first explained that while TCW
officials were serving on CBI's Board, certain members of CBI's
management had been involved in accounting irregularities.  The
statement continues: "The Creditors' Committee . . . does not
believe that TCW was involved in the accounting irregularity
issue.  Nevertheless, the Creditors' Committee believes that
certain claims can be brought against TCW based on decisions made
by them or decisions made by the Debtors while they were officers
or directors of the Debtors." (DX 503.)

reflect either settlement agreement.  In its decision on liability, the Bankruptcy Court stated that there was no evidence that TCW was a tortfeasor.  <u>CBI I</u>, 247 B.R. at 369.  The Court did not explicitly address the Rogers Settlement.

  3.  <u>Review of the Bankruptcy Court's findings</u>

  E&Y argues that the Bankruptcy Court's damages award should be overturned in its entirety because the Bankruptcy Court: (1) abused its discretion by excluding Wiggins's testimony on valuation and damages; (2) deviated from the market comparison methodology for valuing CBI when it selected the 22% sales multiple and included the M. Brenner Sales in CBI's net sales figure; (3) failed to reduce the damage award to take into account CBI's comparative negligence; and (4) failed to reduce the Damage Award to reflect the TCW and Rogers Settlements.[22]

---

[22] E&Y also argues that the Bankruptcy Court incorrectly ruled that CBI and TCW had discharged their duties to mitigate damages.  New York law obligates an individual injured by a wrongful act to make reasonable efforts to avoid, minimize, or lessen the resulting injury.  <u>Wilmont v. State of New York</u>, 32 N.Y.2d 164, 168 (1973); <u>Williams v. Bright</u>, 230 A.D.2d 548, 550 (1st Dept. 1997).  The plaintiff's duty is to make reasonable efforts and take reasonable measures, but he is under no obligation to take extraordinary or costly measures, or measures the efficacy of which is doubtful.  <u>See</u> <u>Allen v. McConihe</u>, 124 N.Y. 342, 347 (1981).  E&Y argues that CBI and TCW failed in their duty to mitigate because they refused FoxMeyer's offer in June 1994, and did not seek to ensure that E&Y completed the Re-Audit or hire new auditors to take over the job.  The Bankruptcy Court disagreed with E&Y, and found that CBI and TCW took reasonable efforts prior to CBI's bankruptcy to mitigate their

The Court addresses each of these arguments in turn.

The Court holds that the Bankruptcy Court did not err by: (1) excluding Wiggins' testimony; (2) selecting the 22% sales multiple and excluding the M. Brenner Sales; and (3) refusing to reduce the Damage Award under the comparative negligence statute. The Court, however, remands the case to the Bankruptcy Court for further proceedings with respect to General Obligations Law § 15-108(a).

### a.  Wiggins's testimony

#### i.  Legal standard

Federal Rule of Evidence 702 provides that a qualified witness may testify as an expert at trial where the witnesses's testimony will assist the trier of fact.  Fed. R. Evid. 702.  To assist the trier of fact, evidence must be "sufficiently tied to the facts of the case" to aid the finder of fact in resolving a factual dispute.  United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985), cited in Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 591 (1993).

A court has broad discretion to admit or exclude expert testimony.  BIC Corp., 23 Fed. Appx. at 38 ("The trial court's discretion is especially broad with respect to the admission or

---

damages.  The Bankruptcy Court's findings are not clearly erroneous.

exclusion of expert evidence."). "The trial court's view of helpfulness is entitled to deference." Id. at 39.

### ii.  Review of Bankruptcy Court's findings

The Bankruptcy Court did not abuse its broad discretion by refusing to permit Wiggins to testify on the issue of valuation and damages. It was within the Bankruptcy Court's discretion to find that the discrepency between Wiggins's proposed testimony and the facts as established at trial rendered Wiggins's testimony unhelpful. Further, the Bankruptcy Court did not abuse its discretion in finding that there were inconsistencies in Wiggins's testimony that supported its decision to exclude his testimony.[23]

### b.  The sales multiple and M. Brenner sales

The Bankruptcy Court did not commit clear error by using the

---

[23]  E&Y also argued that the Bankruptcy Court abused its discretion by permitting Rock to testify as an expert at the Damages Trial. "[T]he admission of evidence in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis." BIC Corp., 23 Fed. Appx. at 39, citing 11 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2885, at 454-55 (2d ed. 1995) ("In noninjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence."). Here, the Bankruptcy Court found that Rock was qualified to testify on valuation and damages, and then declined to accept his conclusions where the Bankruptcy Court believed that the testimony was methodologically unsound or otherwise in error. Therefore, the Bankruptcy Court's decision to admit Rock's testimony was not an abuse of discretion.

22% sales multiple and including the M. Brenner Sales when it calculated the value of CBI's equity.

i.  Legal standard

On appeal, a trial court's determination of damages will be overturned only if it is clearly unsupported by the evidence. See Wilson v. Great Am. Indus., Inc., 979 F.2d 924, 934 (2d Cir. 1992) ("Calculations of damages not finding adequate support in the record may not be affirmed on appeal."), citing In re Wolverton Assoc., 909 F.2d 1286, 1296 (9th Cir. 1990) ("Trial courts have broad discretion with respect to questions of valuation.  An award of damages will only be overturned if clearly unsupported by the evidence.").  When determining value, the trial court "is not bound by the formulas or opinions proffered by expert witnesses.  It may reach a determination of value based upon its own analysis of all the evidence in the record." Silverman v. Comm'r., 538 F.2d 927, 933 (2d Cir. 1976).

ii.  Review of Bankruptcy Court's findings

There was sufficient evidence on the record to support the Bankruptcy Court's decision to use the 22% sales multiple and to include the M. Brenner Sales.

E&Y argues that the Bankruptcy Court's decision was erroneous because Wiggins testified that, under the market comparison methodology, the Court should use a lower sales

41

multiple and exclude the M. Brenner Sales.

The Bankruptcy Court found that the market comparison methodology was "an" appropriate methodology for valuing CBI. This finding, however, did not obligate the Bankruptcy Court to apply only the market comparison methodology, if other evidence on the record would support the Court's decision to use a different valuation approach. Here, Rock testified that it would be appropriate for the Bankruptcy Court to add the M. Brenner Sales if it was going to deduct M. Brenner's long-term debt. The Bankruptcy Court took the 22% sales multiple from the FoxMeyer purchase proposal. Thus the Bankruptcy Court's valuation decision was supported by evidence on the record and was not clearly erroneous.

### c. Comparative negligence

The Bankruptcy Court did not err by refusing to reduce the Damage Award under New York's comparative negligence statute.

### i. Legal standard

Under New York's comparative negligence statute, where a plaintiff's culpable conduct contributed to its injury, a damage award should be reduced by the amount of damages attributable to the plaintiff. N.Y. C.P.L.R. 1411 (2009); Abergast v. Bd. of Educ. of S. New Berlin Cent. Sch., 480 N.E.2d 365, 370 (1985).

ii.  Review of Bankruptcy Court's findings

New York's comparative negligence statute does not provide a basis for reducing the Damage Award.  It is clear from the record that the fraud carried out by CBI's management contributed to CBI's bankruptcy.  On appeal, however, the Second Circuit ruled that the conduct of CBI's managers could not be imputed to CBI itself.  CBI II, 529 F.3d at 453.  CBI, therefore, did not commit any culpable conduct that contributed to its injury; New York's comparative negligence statue is inapplicable.[24]

d.  General Obligations Law § 15-108(a)

i.  Legal standard

Under New York General Obligation Law § 15-108(a), where damages have been awarded against a tortfeasor, the award must be reduced by the greater of: (1) the amount stipulated in any settlement between the plaintiff and a joint tortfeasor; (2) the

---

[24] E&Y claims that New York courts have applied comparative negligence principles even in cases where an auditor has failed to detect employee embezzlement, which is the sort of conduct that would not be imputed to an employer.  The cases E&Y cites, however, establish only that where an employer has been negligent in supervising the employee and the employer's negligence has contributed to the auditor's failure to complete the audit, then comparative negligence can be used to reduce a damages award against the auditor.  See National Sur. Corp. v. Lybrand, 9 N.Y.S.2d 554 (1st Dept. 1939); Craig v. Anyon, 208 N.Y.S. 259 (1st Dept. 1925).  E&Y points to no case holding that comparative negligence is applicable where a court has found that the conduct that contributed to the plaintiff's injury cannot be imputed to the plaintiff.

amount of consideration actually paid for any such settlement; or (3) the amount of the joint tortfeasor's equitable share of the plaintiff's damages.  N.Y. Gen. Oblig. L. § 15-108(a).  Whalen v. Kawasaki Motors Corp., 92 N.Y.2d 288, 292 (N.Y. 1998); Westwood Chemical Co. v. Kulick, 570 F. Supp. 1032 (S.D.N.Y. 1983) (applying comparative negligence to reduce a damage award to reflect settlements the plaintiff entered into with certain potential tortfeasors prior to bringing a lawsuit against the defendant).

For General Obligations Law § 15-108(a) to apply, the settlement agreement must release the joint tortfeasor from claims in tort.  Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir. 1986).  Moreover, the defendant and joint tortfeasor must have caused the same injury to the plaintiff.  Ackerman v. Price Waterhouse, 252 A.D.2d 179, 196 (1st Dept. 1998).

At trial, the defendant bears the burden of proving the joint tortfeasor's equitable share of damages.  Whalen, 92 N.W.2d at 292.; Maione v. Pindyck, 32 A.D.3d 827, 828 (2d Dept. 2006).  To satisfy this burden, the defendant must make at least a prima facie showing of the joint tortfeasor's liability. See Maione, 32 A.D.3d at 828; Gerdik v. Van Ess, 5 A.D.3d 726, 727 (2d Dept. 2004).  If a prima facie case is established, the finder of fact must determine the precise amount of damages to be apportioned to

44

the joint tortfeasor.  <u>See</u> <u>Gerdik</u>, 5 A.D.3d at 727.

### ii.  Review of Bankruptcy Court's findings

The Court remands the case to the Bankruptcy Court to (1) determine whether it is necessary to reduce the Damage Award to reflect the TCW Settlement; and (2) reduce the Damage Award by Rogers' equitable share of liability.

### A.  The TCW Settlement

The Bankruptcy Court held that "there is no evidence that TCW and E&Y were joint tortfeasors."  In the Proposed Findings of Fact and Conclusions of Law that E&Y submitted to the Bankruptcy Court, however, E&Y pointed to evidence on the record about decisions made by TCW employees while they were serving as officers and directors of CBI that could possibly give rise to tort claims.  (E&Y's Proposed Findings, ¶¶ 1318-27.)  For example, E&Y references evidence regarding decisions TCW officials made about: how to address allegations that Castello was involved in the fraud; whether to hire special counsel to investigate the fraud; and whether to sell CBI to FoxMeyer.  It appears from the record that some of these decisions could have contributed to CBI's bankruptcy.  The Court, therefore, remands the case to the Bankruptcy Court for further exposition on whether the evidence identified by E&Y could give rise to tort claims against TCW.  If the Bankruptcy Court determines that

45

there were such claims, then the Bankruptcy Court should consider whether it is necessary to reduce the Damage Award pursuant to § 15-108(a) to reflect the TCW Settlement.

### B.  The Rogers Settlement

The Bankruptcy Court did not explicitly address whether Rogers was a joint tortfeasor, but it did not reduce the Damage Award to reflect the Rogers Settlement.  There is significant evidence on the record, however, establishing that Rogers was a joint tortfeasor for the purposes of § 15-108(a).  The record shows that the Committee would have had intentional tort claims against Rogers, who was a member of CBI's management and a central participant in the fraud.  For example, it was uncontested that Rogers "participated in, or was aware of, the intentional failure to record some liabilities at CBI," and that Rogers knowingly made false management representations in connection with the Audits.  (Uncontested Facts, PTO, at p.10, 13, 20.)  Evidence was offered at trial indicating that Rogers was involved in the advance payment scheme and in the scheme to manipulate CBI's collateral; and that Rogers instructed an employee to deceive E&Y during audits, and discussed using advance payments as a means to hide unrecorded liabilities.  E&Y, therefore, met its burden of making out a prima facie case of tort liability against Rogers.  Any claims E&Y brought against

46

Rogers would have been to recover for the same injury caused by
E&Y's misconduct: CBI's bankruptcy.  Thus the Bankruptcy Court
erred in failing to reduce the Damage Award by the amount of
Rogers' equitable share of liability.

Accordingly, the Court REMANDS the case to the Bankruptcy
Court for further proceedings with respect to General Obligations
Law § 15-108(a).

IV.  <u>Conclusion</u>

For the reasons stated above, the Court holds that: (1) the
Bankruptcy Court had sufficient legal and factual basis for its
ruling that E&Y committed malpractice, but did not have
sufficient basis for its ruling that E&Y committed fraud; (2) the
Bankruptcy Court based its ruling that E&Y's misconduct caused
CBI's injury on sufficient evidence; and (3) further proceedings
are necessary in the Bankruptcy Court with respect to the damages
awarded against E&Y.

Accordingly, the Court AFFIRMS in part and REVERSES in part the Bankruptcy Court's decision, and REMANDS the case to the Bankruptcy Court for further proceedings in accordance with this opinion.

SO ORDERED.

DATED:    New York, New York
          December 4 , 2009

                              _____
                                    KIMBA M. WOOD
                              United States District Judge